Mr. Thomas, thank you for showing up in light of your mobility difficulty. Well, it's not easy to move around New Orleans like that. I can't move around New Orleans like that.     I'm sorry to hear that, Mr. Thomas. All right, the next case of the morning is number 17-30921 in Ray Deepwater Horizon. Barbara versus BP and Johnny's Clams versus BP. And Ms. Lyons, you have the pleasure of arguing before us again when you're ready. May it please the Court. This appeal involves the summary dismissal with prejudice of two complaints of so-called release claimants, Johnny's Clams, Inc. and Jeff Barber. Barber and Clams were both people that worked in the seafood industry. Clams was a person who implanted clams in the sea. And Barber was a captain. They both settled claims in 2011 and 2012 through the GCCF, which was a group, one of the many groups used by BP, this one administered by Mr. Feinberg, who set up the GCCF and who was being paid by BP. Where were their businesses located? Pardon? Where were their businesses located? Johnny's Clams and— Well, they were in the Gulf. I know, but where? In Florida? Florida. Mississippi? Where? I don't recall specifically which part of the Gulf they were from. They were in Florida. Florida. But in any event, both of them had ongoing businesses. Johnny's Clams, I know, had been in business for over eight years. Barber had been in business for many years as a captain. And they both settled their claims in, like I said, 2011, 2012 through the GCCF, which was one of the many groups set up through BP. Just because it wasn't clear in the briefs, am I correct that Barber received in total about $136,000? And Johnny's Clams received about $46,000? Yeah, I can't really do the math. I do have the figures here. But, yes, they received certain funds. Johnny's Clams received $25,000. And prior to that, he had received $21,000. Barber received $25,000 and $40,000 and then about $66,000. One of the things that should be pointed out in terms of the Barber claim is that Barber, what had happened with him, and that should be set forth in the briefs, Barber had basically rented his boat, I guess you'd call it, to BP to use for cleaning up oil. And after they used his boat for I don't know how many months, nine months or something like that, they were supposed to refurbish the boat so it could be used again as a regular boat. But they didn't do that. And they let it sit there for months and months and months. What do you mean they let it sit here? BP. Well, he's the owner, isn't he? Pardon? He's the captain. He owns the boat, right? He owns it, but they had agreed that they would refurbish it because it would cost a lot of money because getting all this oil stuff all over it. Did he operate the boat while it was being used on BP's behalf? Yes. He was operating it on their behalf. They paid him money to clean up the oil as well. He was being paid to clean up the oil spill, but he was supposed to have his boat refurbished so it could be used as a regular boat instead of just an oil cleanup boat. They did not do that for many months, and there is documentation in the record which we showed, which showed that basically the boat was ruined by the time that they finally paid him some money. But in any event, one of the things that is the— Is that one of the releases he signed is when they paid him the money for the boat and he signed a release in exchange for the money? I believe there was a release in terms of the payment for the refurbishing itself. But the main thing, the main question has to do with the fact that these settlements that were made through the GCCF, which was run by Mr. Feinberg, who was being paid $885,000 a month by BP to run this, these were all being done in 2011, 2012, before there was any real determination of what the damages were to the Gulf. And there are letters and affidavits and letters from the Attorney General of the United States basically saying that the goal of the Oil Pollution Act requires interim payments. So what they are supposed to be doing is making interim payments to people so they do not get hard-pressed to accept — excuse me — to accept a payment for less than the value or to accept payment for — excuse me, let me get some water. Oh, sure. For less than the value or before they know what their actual damages are. And this letter from — and this is in the record — letter from the Attorney General says, for GCCF to fulfill its mission, the interim payment process must be efficient, fair, and straightforward. It cannot be a disfavored fallback from the final claims process. When a small business files for interim claims every three months and then waits 90 days for the claim to be resolved, its cash flow is already running six months behind. At that very moment, one needs to get back on its feet. Therefore, I ask you to ensure that the interim claims process functions efficiently and swiftly for claimants, including businesses that submit appropriate documentation, et cetera. And that has been one of the main complaints about the GCCF process, that they were going out there and they were paying off people and saying, we'll give you this money now or you can submit a claim and wait. And everybody was submitting claims and waiting. And that was — Is that exactly what they said? They said, we're prepared to give you this money now with no further investigation. Now, if you want more money, we will have to — you can file a lawsuit and you have that perfect right. You don't have to accept this money. You can find your lawyer if you're not satisfied with this and sue. That's basically what they said, right? Except under the OPA, they were supposed to be making interim payments without requiring releases. And they were supposed to be doing that on a regular basis, and they were supposed to be processing them quickly. Exactly what is your argument here? I mean, we understand the background of this, but I didn't — I thought your brief was saying the releases were under duress and the procedure used by the district court was wrong. And that your clients are somehow wards of admiralty. But you — are you doing a collateral attack on the GCCF at this late date or what? No, that's been an attack throughout, throughout the briefs. It's been an attack that their process that was being used was one to basically not make the interim payments, as they were supposed to be doing, and going out and dangling releases. But you won't know — that's just your evidence to support your claim that the release was invalid. Is that right? You're not saying that we should hold today that the process itself should be set aside? Well, I mean, there were motions to actually set aside all of the GCCF releases. Not in this case. Not, well, in the whole BP case in general. But I know, but that's not part of this appeal. That's not the release you want to take. That's not part of this appeal, but that is part of the evidence that was before the Court, that there were certainly problems in these GCCF releases. But what has that got to do with your claim today that the releases at issue were signed under duress? Well, if you — What has that got to do with it? If you refuse to pay somebody the interim payments that they're supposed to be paid and come to them with a bag of money and say, okay, you can have this now or you can wait — They didn't say that. They said you can have this now or you can sue, right? Or you can sue. What's wrong with that? I mean, you expect them to say you can — Well, first of all — — just name the amount you want, I will give it to you? They were supposed to be processing these as interim claims. They were not supposed to be getting final releases. That's under the Oil Protection Act, Oil Pollution Act. Well, is that one of your claims here, is that the releases are not authorized? The releases — we say that the releases should not have been — the Court should not have summarily dismissed these claims as being released without taking any evidence concerning the methodology under which they were obtained. Well, the Court knew what the methodology was because it prescribed the methodology and proved everything every step of the way, didn't it? No, not really. There were letters from the attorney generals — letters and affidavits from the attorney generals of each of the Gulf Coast states protesting the manner in which these releases were getting — being gotten. And also the fact that — I understand your case, and maybe I'm not understanding it, but that the releases here are invalid because they were obtained under duress. And the duress, you claim, is they offered you the money or you could wait and you could sue later and get more money if you wanted to go to court. And you couldn't afford to do that because of family considerations that you needed to put bread on the table. Is that your case? In part. The fact is that they were obtaining these releases before anybody had any idea what the damages were. One of the things from the State of Louisiana says the Court had stayed — Well, they told you that. They didn't make you sign the release. They said you can sign the release and get your money here, or you have a perfect right to go hire your attorney and perhaps get more money, a lot more money. Or they could drive up to you while you're sitting in your car with your head bleeding and say, we'll give you money now. But that's not what happened with Mr. Barber or Mr. — the fellow who was Sheridan. And at least one of them had an attorney, right? None of them had an attorney at the time. All right. Not at the time. Okay. But again, I mean, the language is quoted in the judge's ruling here, and it says, understanding your rights, the quick payment final claim form contains important information. Do not sign the release unless you understand and agree to its terms. If you are represented by an attorney, consult with the attorney. The attached release is a binding legal document. By signing this document, you are forever waiving and releasing all claims. You are under no obligation to accept the final payment. Of course, your clients have not returned the money. I mean, if they rescind the release, don't they have to return the money? That would probably be the case if they were owed less than what they already received. But the fact is that these releases were being obtained before anybody knew what the damages were. That was one of the reasons that the attorney generals from each of the states said— Well, your clients knew what the damages were. I had a good idea about it, didn't I? Your client, who signed the release, knew how he'd been damaged and what he was being paid for. He had no idea. Nobody had any idea what was going to happen to the Gulf states at that point. The attorney general from the state of Louisiana, for example, says, we have not been allowed to have any discovery whatsoever in connection with this case. We do not have sufficient information about what the situation is. We do not know what the damage— What case are they talking? The attorney general had his own cases, did he not? The states had cases of this. They did, but they were writing these on behalf of the people. And they were very strongly objected to the exclusion, first of all, of the release claimants, and they all filed motions to have the release claimants—the releases canceled. And Judge Barbier, earlier, in connection with the settlement agreement, had said, in response to this issue about canceling the releases or invalidating the releases, he said, this is an issue that can be pursued only by means of cases bought for resolution to this court or another court, at which point it would be for BP to decide whether to assert such a GCCF release as an affirmative defense, and then for a plaintiff to attempt to establish that the release is invalid. But that's not what happened. What happened is the Court asked BP to file a motion listing everybody who was a release client, and then the Court simply looked at the language, which you can put any language you want in a release, looked at the language of the releases, and said they were valid, and some merely dismissed everybody who was a release client. Let me ask you a question. Did the Court even have to do that? In other words, BP has releases. Why did the Court have to instigate this procedure to dismiss, further dismiss claims that had already been released? Well, first of all, all these release claimants, and there were over 200,000 of them, were in the class action that we talked about yesterday. They were all in there, because most of these people, and Barber and Clams were one of the few that have big enough claims to make it worthwhile to file an individual lawsuit. Most of these were, you know, poorly paid, low-level seafood workers, and it wasn't worth it to file individual causes of action for any of them. So why didn't your clients proceed through the claims facility? Because they had already released? Is that why? Well, first of all, by that time, yeah, they were released, and there were, like, several layers of these things. And in terms of filing a lawsuit or some alternative, all these cases were stayed for seven years. That is not really a good alternative, as far as I'm concerned. If you have immediate money, you need money, and your alternative is to file a lawsuit, which you know is going to be stayed, because they're all stayed. Okay. Well, you're stayed now pending rebuttal. Thank you. Mr. Nielsen. May it please the Court. My name is Aaron Nielsen. I'm here on behalf of BP. I want to start with something that I thought was notable from the argument and the briefs. They never actually addressed what Judge Barbier said in his order. Judge Barbier said there is no duress as a matter of law because Congress in the Oil Pollution Act gave you two reasonable alternatives. If you don't like how the responsible party is paying you, you can either file a lawsuit, like Judge Jolly was mentioning, or you can go to the Oil Spill Liability Trust Fund, which is administered by the Coast Guard. BP, as Judge Barbier explained, is not a party to that at all. You go to the Coast Guard, and you say the responsible party is not paying the interim payments. Pay me. They have no answer for that liability trust fund. They have never had an answer for the liability trust fund. So Judge Barbier said, well, why don't you just go to the trust fund? And their answer is, well, you know, this was 2011, and the trust fund wouldn't have paid us in 2017, which is entirely not responsive to the point, which is in 2011, what were your options? And their options were either file a lawsuit or you could go to the Coast Guard. They didn't do either one, and now they have buyer's remorse, and they're trying to get out of the releases that they signed. Would they have been entitled to file claims through the claims facility, whatever that acronym is? No, Your Honor. Okay. And that's because in the settlement they excluded everybody who had previously filed, who had previously released their claims. All right. And the other question I have is they do make an argument that under Florida law, alternatives are not available if you're talking about an individual economic duress claim as opposed to a business-based duress claim. Well, correct. That is what they say, Your Honor. I would note that Johnny's Clams sure sounds like a business to me, as does Jill Barber, who was in a contractual relationship with BP to go out and do the Vessels of Opportunity Program to clean up the oil. To me, Barber could have sued BP separately, totally apart from the Deepwater Horizon, if they didn't fulfill their contractual duty to clean up his boat. Correct, Your Honor. Exactly right. And I want to clear up the record on this point as well. My friend here says that Jill Barber did not have an attorney. That is true for the first one as a shrimper, which was in August of 2011. He signed two releases. He also has a release as, you know, essentially working for BP to clean up the oil spill. And there I called the Court's attention to page 15861 to 15862 of the record, which is his affidavit, where he says, I retained David Cross, quote, I agree to Mr. Cross making a claim to BP for a loss I sustained as a result of the VOP, the Vessels of Opportunity, delaying inspection. And that lawyer — I could go further. You know, I received a letter from Mr. Cross saying that I should sign this thing, directing me to sign and return BP a form of final release. That was done with a counsel, with a lawyer. So to say that that was done under duress makes no sense at all. Surely a counsel, a counsel, which, by the way, is not in their complaint or anything, in the affidavit, surely a counsel knows that you can file a lawsuit or you can go to the Coast Guard. And to go to the point that they make, well, the litigation was stayed, that, again, is not responsive to the Coast Guard point. You can always go to the Coast Guard, for which they have never had an answer, other than to say, yeah, but that wouldn't have worked in 2017, which is just a non sequitur. But the first point is, well, what about going to a lawsuit? Well, this is what I would do if I was in that situation. If I thought the lawsuit would be stayed, I would ask for a preliminary injunction. I would say, Your Honor, they have a duty — You can't get money on a preliminary injunction. Well, you can't get money on a preliminary injunction, but you can say they have to change how the GCCF is operating. And then you can go up on appeal immediately. So there's an — we can go through the preliminary injunction factors if we needed to. But my point is that an effective denial of injunction is immediately appealable. They didn't do that either. So that's not responsive. But, again, the easiest, simplest, cleanest way to get rid of this case, which is the way that Judge Barbier did it, is he said, go to the Coast Guard. Congress in the Oil Pollution Act has set something up, and you don't have to deal with BP. And the way it works is if the — How much has the Coast Guard paid out? The Coast Guard has not paid — they were authorized by Congress, I believe, to pay up to a billion dollars on these things. They did not pay anywhere near that, is my understanding. And that's because the GCCF process was very generous. So most people went through the GCCF process. But the question is, if you didn't want to, what were your options? Were you under duress? And the answer was no. I'm going to go back to your question earlier about Florida law and whether this applies to — whether the reasonable alternative test is part of it. First, I would, you know, urge the Court to look at their pleadings below. They concede in their motion for reconsideration that reasonable alternative is a factor, which should be kind of the end of this thing. They concede Judge Barbier's statement of the law. But I would look even more broadly. The test is under two different versions of it. So even assuming they're not businesses, though one is Johnny's Clams, which is obviously a business, and the other was hired to run a ship for BP to go clean the oil, obviously a business. But even leaving that aside, the other tests say you essentially have no free will. Well, if you have alternatives, you have free will. It's half a dozen, one, you know, six on the other. It's the same idea, which is you have to be able to have no volition. If you have, as Congress has set up here, alternative means to pursue your rights, you have — you haven't lost your free will. You have reasonable alternatives. And again, that's exactly on the face of Judge Barbier's decision. So I'm still waiting for the answer to what Judge Barbier said, and I haven't seen it and I haven't heard it at their argument today. Is this a motion to dismiss or a motion for summary judgment? Well, with respect, Your Honor, we understand it as a dispositive motion, as a motion to dismiss. That's how we filed it. Judge Barbier in PTO 64 said file a dispositive motion. We filed a dispositive motion. We think it's a matter of law, and Judge Barbier agreed that if you have reasonable alternatives, which can be resolved on a motion to dismiss, I would point the Court to the Global Leader case or Leader Global case on the other, excuse me, which was resolved on a motion to dismiss. But here's the other point about that. If they thought they needed discovery, it was incumbent on them to ask the Court for discovery, or at least to make that argument in their briefs. They never once said we want discovery. It wasn't until after Judge Barbier said I'm going to dismiss your claim that they filed a motion for reconsideration where they agreed with him on the law and said, by the way, this should have been summary judgment. But Judge Barbier, they never told him that before, and you can't raise that on a motion for reconsideration. If you needed discovery, if you said that there are fact issues that can't be resolved as a matter of law, it's incumbent on you to tell the district court, and they didn't do that. Did they ever suggest what the facts were that would be revealed in discovery that would support their case? I don't think so, Your Honor. They do allege some of the things that we're hearing today, but that doesn't go to the question of duress, which is what were your reasonable alternatives. And they never talk about why the Oil Pollution Act, how it sets up the Coast Guard as a reasonable alternative. They don't say anything about that, nor do they really explain why you can't bring a claim just in court like a lot of people did. And I want to talk a little bit about the exigency point. I think the Court should look at the chronology of how this thing happened. So the oil spill is in April 2010. It's closed. The well is closed in September 2010. We're talking now about releases that were signed in July or August or the separate one for the ship in July or August 2011 or the ship in May 2012. So this isn't like, you know, you've got five minutes to sign this. They've had a year to look at the situation. And they didn't end up filing their complaint, that first complaint, until April 19, 2013. So you look at some of the cases. There's an exigency. The wedding is going to happen tomorrow, or you're going to lose all of your money if you don't do something right now. That wasn't the situation at all. And, in fact, you know, as to Joe Barber, he gets a lawyer and has time to do all of that as well. Was he receiving these interim payments during that period, or did they come afterwards? It's $146,000. It was in increments. Correct. I believe, I don't have that exact chronology off the top of my head. I believe those payments were before because they were wrapped up in the shrimper's release. But I don't have that off the top of my head. So, again, I just say for the court, you know, I don't want to belabor the point, but look at what Judge Barbier said. Judge Barbier is not out to get anybody. Judge Barbier looked at this and said, I can read the Oil Pollution Act. I can read what it says in, you know, Section 21. I can read what it says in the section about authorizing suit or going to the Coast Guard. And you didn't do that. So this is just an easy case. The fact that the MBL 2179 is complicated doesn't mean that every question in it is complicated. This is a really easy question. Do you have reasonable alternatives? Yes. Yes, you do. You've got at least two of them. So even if you assume all of the horrible things they had to say about BP are true, which they're not, but even if you assume all of them are true, that BP wasn't making interim payments or so on and so forth, it wouldn't change the reality that they had reasonable alternatives when they filed this. So, again, they didn't have a ‑‑ they had free will. Thus, when they entered into the agreement and took the money, which they haven't paid back, that really ought to be the end of the issue. And that, of course, doesn't have any further questions. Are you going to be back here next month? I will, Your Honor. Okay. We're almost there. Yeah, I've heard that. We see the end. Thank you. Ms. Lyons? Ms. Lyons? Let me address some of these specific items that are brought up by counsel. First of all, talking about these reasonable alternatives, filing a lawsuit to me is not a reasonable alternative when these cases have stayed and are still stayed. There has been no discovery. There has been nothing done. Did you ask for discovery? Pardon? Have you ever asked for discovery? The court stayed. All discovery ‑‑ Did you ask for it? Did you ask for it? Originally, discovery was asked for. Did you ask him to remove the stay from discovery? I don't know whether or not there's been motions by everybody to remove the stay. I'm talking about you, not everybody. Me personally? Your client. I personally don't recall asking to remove the stay, but the court issued a blanket stay of all discovery and all cases. So all these cases have just been sitting there for now nine years. Anybody who filed a case has been sitting there for nine years with no discovery. That was one of the chief complaints by the state attorney generals is their inability to assess what the damages were. That was back in 2011, right? Pardon? That was back in 2010 or 11, was it not, that the attorneys general were writing these letters? They wrote several things. The one I quoted from was in 2012. Okay. Did you ever tell the court ‑‑ I'm sorry? Did you ever tell the court, I guess you did not tell the court, why you needed discovery if you never asked for discovery? What would you have discovered if you had had discovery? What is the crucial evidence that if you had had discovery it would change the result of the judge's ruling? Well, it depends on the particular case. I'm talking about the cases that we're talking about today. Cases today, I assume you would have asked for information about the manner in which the releases were obtained, the manner in which the calculations are computed. Your client knew all of that. I'm sorry? Your client knew all of that. He knew how the releases were obtained from him or from ‑‑ You might have wanted to depose the people who took the releases. Right. But let me ask you, have you spoken to either of these plaintiffs before you came here today? Do they know that their cases are up before us today? I'm sure they know that they're up here. Have I spoken to them today? No. But I mean ‑‑ Do they know you're arguing? They're aware of the fact that these are up on appeal. They know you're arguing here today. I don't know if they specifically know we're arguing here today. They do. They do. Okay. Okay. One of the things that they talked about, too, is this oil spill liability trust fund. Well, the oil spill liability trust fund had a three‑year statute of limitations. And there was no determination made that these releases were valid until October of 2017. So by then, the statute of limitations for filing anything with them had expired. Now, wait a minute. I mean, why would a release of BP prevent them from going to a government fund? I'm sorry? Why would a release given to BP prevent your clients from going to the government fund? I'm not exactly sure how that worked. But, I mean, it was one of the many avenues that was open to people. But my understanding is that, first of all, the oil spill liability trust fund never paid anybody anything. And they were also expiring in December of 2017. There was also discussion about Barbara had an attorney at some point in time, which he did, obviously. He had us at some point in time. But when his first release was signed, which was termed a full and final release, that was in August of 2011. And he certainly did not have an attorney at that time. And BP's counsel says, basically, yay, we're almost finished here, which I'm sure everybody would like to say the same thing. But one of the things I found in a case concerning multidistrict litigation is that we grant great deference to the court in administering multidistrict litigation. Proceeding with due process and fundamental fairness may not be sacrificed to provide assembly line justice. The plaintiffs retain their individual identities. The courts still have to, besides the statistics, besides wanting to get all this stuff over with, which I know everybody wants to, we still have to provide full and fair justice to the claimants. Yes, ma'am. Thank you.